```
                    UNITED STATES DISTRICT COURT
                        DISTRICT OF VERMONT
```

WILLIAM BOUDREAU              :
                              :
    v.                        :       FILE NO. 1:04CV348
                              :
HARTFORD LIFE AND ACCIDENT    :
INSURANCE COMPANY             :
_____:

<u>RULING ON CROSS MOTIONS FOR SUMMARY JUDGMENT</u>
(Papers 11 and 18)

### <u>I. Background</u>

Defendant Hartford Life and Accident Insurance Company (hereinafter "Hartford") funds the Employee Benefit Plan (hereinafter "the Plan") under which the plaintiff has received disability benefits for approximately ten years.  In relevant part, the Plan provides: "Totally Disabled means: (a) during the Elimination Period; and (b) for the next 24 months, you are prevented by Disability from doing all the material and substantial duties of your own occupation.  After that, and for as long as you remain Totally Disabled, you are prevented by Disability from doing any occupation or work for which you are or could become qualified by training, education or experience." Administrative Record (hereinafter "Record"; appended to Paper 12) at 4.

The plaintiff, William Boudreau, now in his late 50's, has suffered from epilepsy since he was three years old.  He has a substantiated history of suffering from partial complex seizures

1

which, together with other conditions, compromise his ability to perform most types of jobs.

From 1970 until 1993, he successfully worked as a dishwasher, tray server, and housekeeper for the Vermont Health Foundation, Inc. (hereinafter "Vermont Health"), the provider of the Plan.  It is undisputed that the plaintiff was able to maintain this long-term employment because of special and personal "workplace accommodation [provided by medical staff, coworkers and supervisors at Vermont Health] which apparently helped to control the frequency of his seizures."  See, e.g., Record at 85.

In December 1993, following a change in his work schedule, the plaintiff began experiencing more frequent and severe seizures.  On December 14, 1993, he stopped working due to increasingly uncontrolled epilepsy, brought on, at least in part, by job-related stress and difficulties with a new supervisor.  Since ceasing work, Mr. Boudreau also has suffered from other medical problems which affect his ability to work, including knee problems, breathing problems, and other conditions related to obesity.

Hartford periodically reviews the plaintiff's condition to determine whether he remains totally disabled as defined by the Plan.  The company maintains that, in the past several years, the severity of plaintiff's seizure disorder has reportedly

diminished, thereby allegedly resulting in his renewed ability to work.

For example, in a July 9, 2001 report, Dr. Keith Nagle, the plaintiff's neurologist, indicated that Mr. Boudreau had only self-reported one seizure in the preceding month. In addition, on or about August 19, 2002, another of the plaintiff's attending physicians, family practitioner Dr. Timothy Terrien, informed a Hartford representative of the following:

> In the time period between 1/28/02 and 8/19/02, Mr. Boudreau was seen seven times . . . . During this time Mr. Boudreau's issues were primarily associated with his smoking, COPD, and oxygen saturation. No issues regarding his seizure disorder were raised during these visits. . . . Dr. Terrien completed an Attending Physician Statement in which he indicated that Mr. Boudreau could stand one hour, walk one hour, and sit four hours daily. He indicated that Mr. Boudreau was unable to drive or keyboard, but that he could lift, push, and pull ten pounds.

Record at 85-86.

After receiving this information, Hartford referred the plaintiff's medical file to F.B. Dibble, Jr., M.D., a physician who is board certified in family practice. Dr. Dibble consulted with plaintiff's treating physicians, Drs. Terrien and Nagle, and examined the plaintiff's medical records. Dr. Dibble concluded, and the plaintiff does not dispute, that Mr. Boudreau currently is "undertaking the activities of daily living and attending his medical appointments successfully within the limitations of his diagnosis." Paper 12 at ¶ 26. In addition, the plaintiff

performs household chores and is able to mow his lawn using a push mower. Paper 12 at ¶ 27.

In addition, Dr. Dibble reviewed the results of a neuropsychological evaluation requested by Dr. Nagle and performed by Janice Peyser, Ph.D., on May 9, 2000. See Record at 367-369. Dr. Peyser conducted her evaluation to aid in deciding whether Mr. Boudreau was a suitable candidate for surgery to control his epilepsy, a procedure he and his doctors eventually decided was inappropriate. She administered, inter alia, the Wechsler Adult Intelligence Scale-Revised, and noted that the plaintiff, who dropped out of school in the 10th grade, scored a Verbal IQ of 73, a Performance IQ of 81, and a Full Scale IQ of 79, "correspond[ing] to the 8th percentile and fall[ing] in the upper limits of the Borderline range," a result which is consistent with "long-standing levels." Record at 368.

After conducting a battery of language, reasoning, memory and other tests, Dr. Peyser opined:

> Mr. Boudreau is a 53-year-old strongly right-handed man with diffuse impairment of high order cognitive functions. Perhaps the most striking areas of deficit are impairment of speech sounds discrimination and frontal regulatory and reasoning functions. Memory, particularly for information that is inheritantly [sic] organized and meaningful, is an area of relative strength. Chronic difficulty with learning and processing language-based information [and] a strong right-hander without family history of left-handedness suggest left hemisphere involvement. To the extent that there are any motor or sensory perceptual findings, these lateralize to the right hemisphere. These deficits are not particularly striking however.

Record at 369.

Based upon his review, Dr. Dibble concluded the plaintiff is now capable of pursuing very limited forms of sedentary employment.  He recommended plaintiff work in an environment accompanied by others and that he not be left alone for long periods.  He further recommended Mr. Boudreau avoid exposure to heights, hazardous machinery, heat-producing processes, and driving.  See Paper 12 at ¶ 35.

On or about July 17, 2003, a Hartford clinical case manager also reviewed Mr. Boudreau's file.  On July 24, 2003, this case manager informed Mr. Boudreau

> that from a neurological standpoint file documentation supports that there are no neurological deficits or worsening of mental abilities.  It was documented that increased stress and sleep deprivation triggers your seizures.  It is reported that you have an aura of sensation of nausea prior to a seizure and your seizures are complex partial that last for a few seconds without loss of consciousness.  The restrictions and limitations provided include the following:
>
> - The ability to work in an area whereby someone is around or near you should you experience a seizure.
> - No climbing or heights.
> - No driving.
> - No exposure or requirement to be around dangerous equipment or machinery.
> - No job with pressure or stress.
> - The need for stable hours during the day and stable job in that you are not shifted from one job to another.
> - An occupation that is sedentary and unskilled.
>
> In summary, it does not appear that neither [sic] your physical or neurological limitations would have a

>  significant potential to interfere with your becoming reestablished in the workforce.  Your limitations do not represent the inability to perform the demands of sedentary level employment.

Record at 41.

In summary, based upon his inability to return to work, the plaintiff received disability benefits from June 14, 1994 until July 31, 2003, since he was "totally disabled" as defined by the Plan.  Possibly prompted by a recent report suggesting some diminished seizure activity, Hartford determined that the plaintiff is no longer totally disabled, and, by a letter dated July 24, 2003, notified Mr. Boudreau that he no longer meets the definition of total disability under the Plan.  See Record at 37-43.  After the plaintiff's administrative appeal, Hartford affirmed this determination.  See Record at 509.

## II. Discussion

On cross motions for summary judgment, each moving party has an initial burden of informing the Court of the basis for its motion and of identifying the absence of a genuine issue of material fact.  See, e.g., Chambers v. TRM Copy Centers Corp., 43 F.3d 29, 36 (2d Cir. 1994).  Where, as here, a motion for summary judgment is supported by affidavits or other documentary evidence, the party opposing that motion must set forth specific facts showing there is a genuine, material issue for trial.  See Rexnord Holdings, Inc. v. Bidermann, 21 F.3d 522, 526 (2d Cir.

1994).  Only disputes over facts which might affect the outcome of the suit under the governing law preclude the entry of judgment.  See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

This matter involves the plaintiff's appeal of the defendant's decision to terminate disability benefits under a Plan governed by The Employee Retirement Income Security Act of 1974 ("ERISA").  The parties agree this Court's review of the defendant's decision must be conducted under an "arbitrary and capricious standard."  See Def.'s Mot. for Summ. J. (Paper 11) at 1 (denial of benefits "was not an arbitrary and capricious exercise of . . . discretion"); Pl.'s Mot. For Summ. J. (Paper 18) at 1 (arguing decision "is not supported by the administrative record and is arbitrary and capricious").  The Court agrees and, therefore, will apply this standard.  See Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101, 115 (1989); Donatiello v. Hartford Life & Accident Ins. Co., 344 F. Supp. 2d 575, 579 (E.D. Mich. 2004).

"The arbitrary and capricious standard of review is highly deferential to a plan administrator.  The question before the reviewing court under this standard is whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment."  Jordan v. Retirement

Comm. of Rensselaer Polytechnic Inst., 46 F.3d 1264, 1271 (2d Cir. 1995) (citations and quotations omitted).

The Court may not overturn a plan administrator's "reasonable" interpretation. Id. Nevertheless, the deference afforded an administrator's decision is not absolute. See Curtin v. Unum Life Ins. Co. of America, 298 F. Supp. 2d 149, 157 (D. Me. 2004) (cases which indicate administrators may consult their own experts "do not stand for the proposition that an insurer may deny claims based only on the unsupported conclusions of its employees"). The Court may overturn a decision made "without reason, unsupported by substantial evidence or erroneous as a matter of law." Kinstler v. First Reliance Standard Life Ins. Co., 181 F.3d 243, 249 (2d Cir. 1999) (citations and quotations omitted); accord Pulvers v. First Unum Life Ins. Co., 210 F.3d 89, 92 (2d Cir. 2000). Stated differently, "the arbitrary and capricious standard asks only whether a factfinder's decision is plausible in light of the record as a whole." Colby v. Unumprovident, 328 F. Supp. 2d 186, 190 (D. Mass. 2004) (quotations and footnote omitted).

Based upon a complete review of the administrative record, the Court finds the defendant's determination that the plaintiff is no longer entitled to disability benefits is arbitrary and capricious and otherwise unsupported by substantial evidence. Nowhere does the administrative record contain a medically-

supported statement which warrants a conclusion the plaintiff's epilepsy is recently and sufficiently under such control so that he has suddenly become able to work.

Hartford's own factual contentions succinctly set forth the problem with its position.  In its "Statement of Undisputed Facts" filed in support of its summary judgment motion, Hartford explains:  In 1994, "[a]s a result of the increase in seizure activity, The Hartford found that Mr. Boudreau met its definition of 'disabled' and paid him long-term disability benefits."  Paper 19 at ¶ 20.  In response to this "undisputed" contention, the plaintiff states:  "Disagree.  This is an incomplete statement of Hartford's reasons for granting disability benefits.  Mr. Boudreau was granted long term disability benefits based on his medical condition, limited education, limited intellectual ability and lack of transferrable skills."  Paper 35 at ¶ 20.

In actuality, Hartford's own records from July 1996 so describe Mr. Boudreau's long-standing, extensively documented conditions.  Plaintiff's inability to engage in other forms of employment stems from multiple conditions which Hartford employees have characterized "uncontrollable seizure disorder, morbid obesity, some ambulating difficulties, low stress and interactionary tolerance, and limited intellectual ability."  Record at 125.  Viewed in a light most favorable to Hartford, the record suggests the plaintiff "may" currently be experiencing

fewer seizures than in previous years; it does not support a conclusion that his condition as a whole is so improved that he is now employable.  See Record at 322 (to Dr. Nagle, plaintiff "reports having greater than one [seizure] per month but then that he might go one or two months without an episode"); 498 (Dr. Terrien reports to Hartford his impression that plaintiff's seizures remain "unpredictable" and occur "perhaps one seizure weekly").  In fact, as of May 19, 2003, Mr. Boudreau's "Ability Profile," generated by Hartford, shows virtually "no change" in any of the other conditions which contributed to the disability determination.  See Record at 374, 376 (with the exception of a change in "strength" from "M Medium" to "S Sedentary," the profile consistently reports "no change" in plaintiff's "specific vocational preparation," "general educational development," "physical" abilities, "environmental" tolerances, "aptitudes," "temperaments," or "work functions").

Thus, for over ten years, the defendant has judged the plaintiff to be eligible for long-term disability benefits for a variety of reasons which, as of the date of its decision to terminate those benefits, have remained largely unchanged. Virtually nothing in the administrative record supports a finding that the plaintiff's chronic medical conditions, lack of education, limited intellectual abilities, or non-existent transferrable skills have undergone material improvement.  Viewed

objectively, this denial of benefits, otherwise based little more than a "got cha" rationale that the plaintiff did not appear for a unilaterally scheduled examination, see Paper 11 at 21, is not rationally-based and appears to be prompted by considerations unrelated to any improvement in the plaintiff's ability to work. See, e.g., Black v. Unum Life Ins. Co. of America, 324 F. Supp. 2d 206, 216 (D. Me. 2004)("In this Court's assessment, Dr. DiDonna's review is not reliable and it was unreasonable for Unum to rely on this review while ignoring (without explanation) the other medical information contained in the administrative record that overwhelmingly suggested that Black's condition had not improved to the extent that he could perform the material duties of his occupation.").

## Conclusion

The Court finds Hartford's decision to terminate Mr. Boudreau's diability benefits is arbitrary and capricious.

Hartford's Motion for Summary Judgment (Paper 11) is DENIED. The Plaintiff's Cross Motion for Summary Judgment (Paper 18) is GRANTED.

Hartford shall pay Mr. Boudreau all benefits due from the date of the original termination of benefits and continuing until a new claim review is conducted.

This matter is remanded to Hartford so that the defendant may conduct a new claim review to determine whether the plaintiff

remains totally disabled as defined by the Plan and therefore is or is not entitled to continue receiving disability benefits after the date of the new claim review.  See Colby, 328 F. Supp. 2d at 192.

SO ORDERED.

Dated at Brattleboro, Vermont, this 2nd day of September, 2005.

/s/ J. Garvan Murtha
J. Garvan Murtha
United States District Judge